United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SYNNEX CORPORATION,**
Plaintiff,
v.
**AXIS INSURANCE COMPANY,**
Defendant.

Case No. 4:20-cv-07244-YGR

**ORDER GRANTING IN PART AND DENYING IN PART SYNNEX'S MOTION TO EXCLUDE AND FOR PARTIAL SUMMARY JUDGMENT;**

**GRANTING IN PART AND DENYING IN PART AXIS'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Dkt. Nos. 80, 83, and 89

This action involves an insurance coverage dispute. Plaintiff Synnex Corporation, the insured, moves for partial summary judgment on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Furthermore, Synnex moves to exclude the testimony of Patrick C. Haley under Fed. R. of Evid. 702 and *Daubert*.[1] (Dkt. No. 80.) Defendant Axis Insurance Company, the insurer, bring a cross-motion for summary judgment on the grounds that the insurance policy does not cover Synnex's loss and, even if it did, because there was a genuine dispute about the possibility of coverage, it could not have acted in bad faith.

Having considered the parties' written and oral arguments, the admissible evidence submitted, and for the reasons set forth herein, the Court hereby **GRANTS IN PART AND DENIES IN**

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Court also notes that plaintiff's motion only relates to liability, not damages.

**PART** each motion.

## I. BACKGROUND[2]

### A. The Underlying Theft

The underlying factual circumstances giving rise to this action are not generally disputed despite a myriad of objections.[3]

In August of 2019, Synnex's warehouse, located in an industrial park in Mexico City, was robbed of all its contents.[4] (PSF 5.) The stolen contents included software that was preinstalled on

[2] For clarity, citations to "(JSF #)" refer to numbered facts contained in the Joint Statement of Stipulated Facts. (Dkt. No. 84.)

Citations to "(PSF #)" refer to the numbered facts contained in plaintiff Synnex's Separate Statement of Additional Undisputed Facts. (Dkt. No. 83-2.)

Citations to "(PSF2 #)" refer to the additional numbered facts contained at the end of plaintiff Synnex's Responsive Separate Statement. (Dkt. No. 93.)

Citations to "(DSF #)" refer to the numbered facts contained in defendant Axis's Separate Statement of Undisputed Material Facts. (Dkt. No. 82.)

[3] Defendant Axis's Response to Plaintiff's Separate Statement of Additional Undisputed Facts in Support of its Motion for Summary Judgment includes boilerplate objections without any argument as to why a particular objection applies. (Dkt. No. 90, 96.) A party who asserts that a fact is genuinely disputed must support the assertion with evidence and argument. *See* Fed. R. Civ. P. 56(c)(1). Axis cannot avoid summary judgment by asserting generalized evidentiary objections to each of Synnex's proposed facts, without providing argument as to why the objection is valid or proffering evidence that creates a dispute of fact. Conclusory assertions that a fact is in dispute without support are not credited. *See Seaman v. Pyramid Technologies, Inc.*, No. SACV 10-00070 DOC (RNBx), 2011 WL 5508971, *5 (C.D. Cal. Nov. 7, 2011) ("The party opposing a summary judgment motion cannot simply rely on seemingly baseless assertions and expect the Court to search for facts that may or may not support those conclusory arguments"); *see also Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment"). Defendant's purported "objections" are disregarded unless evidence in the record or legal argument otherwise supports the position. The facts in this section are considered undisputed unless otherwise noted and the Court highlights remaining factual disputes where appropriate in this order.

[4] Synnex presented evidence that the stolen contents of its warehouse were worth close to $14 million. (PSF 5.) Axis disputes this amount. Synnex submitted an affidavit from its Vice President of Finance for Latin America, Ignacio Sanchez Santodomingo, in support of its calculation. (Dkt. No. 85-30, J. Ex. 30.) The affidavit itself notes that Axis disputed the worth of the stolen contents. (*Id.*) For example, Axis disputed the value of some of the products that sat in the warehouse because their purchase by customers was delayed or cancelled. (*Id.*) Mr. Santodomingo argued that these products still had worth; "[p]roducts that have not reached their end of life date . . . should not be discounted to zero." (*Id.*) It may be the case that these products were not worthless but even Mr. Santodomingo admits that the value of the products could be discounted. Because there is a genuine dispute on this issue, the Court **SUSTAINS** Axis's objection and will not consider this evidence here.

various integrated computer hardware products and devices. (JSF 40, PSF 26.) The Mexican police who investigated the theft concluded that some security guards likely aided the robbers. (PSF 12–13.) One of those guards, a man who called himself Jose Luis Quintero Hernandez ("Mr. Quintero"), was stationed in Synnex's warehouse the night of the robbery.[5] (JSF 16.)

Mr. Quintero worked for Servicios Profesionales de Vigilancia Metropolitana S.A. de C.V. ("SPVM"), with whom Synnex contracted to secure its warehouse.[6] (*Id.*) Notably, Synnex did not have a contract directly with Mr. Quintero but with SPVM. (*Id.*) That contract ("SPVM Contract") states in relevant part:

> When the service need[s] to be provided out of [Synnex's] facilities or from a third party, [Synnex] will warn [SPVM] about all the rules and specific norms or practices to be accomplished in [Synnex] facilities or from a third party, therefore [SPVM] will instruct its personnel about the appropriate indications to fulfill these norms.
>
> [SPVM] will be the only [one] responsible for assuring its personnel respect at all times the security norms [e]stablished by [Synnex] and/or third parties, as well the schedule [e]stablished by [Synnex] and/or third parties for service provision, having to compensate [Synnex] and/or the third party for any damage and injuries caused by failure to comply [with] them.
>
> * * *
>
> [SPVM] shall allocate in the fulfillment of its obligations to the necessary persons it deems appropriate for the proper provision of the contracted services; these will be under his direction and subordination at all times, this is why [SPVM] will have the power of command to determine the services that such persons shall provide . . . and the needs [Synnex] notifies.
>
> Therefore, [Synnex] may not, under any circumstances, order directly or indirectly the workers of [SPVM], the performance of any activity related to the provision of the services of this [contract].

---

[5] To support its claim that Mr. Quintero was involved in the theft, Synnex presents as evidence an insurance report compiled after the fact by Transit Risk Management, a company hired by another of Synnex's insurers to investigate the theft. Axis objects that this is inadmissible hearsay under Fed. R. Evid. 801. Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Synnex, however, did not submit this insurance report to prove that Mr. Quintero was involved in the robbery. Instead, Synnex provides the insurance report for the purpose of establishing that there is a reasonable basis for insurance coverage. For that reason, Axis's objection is **OVERRULED**.

[6] The warehouse was leased by Westcon Mexico S.A. de C.V. ("Westcon"), a subsidiary of Synnex. Because the parties do not argue that this distinction is material, the Court refers to both Synnex and Westcon as Synnex throughout.

United States District Court
Northern District of California

* * *

> For workers used to fulfill the obligations under this [contract], [SPVM] unconditionally assumes the character of employer.
> As a result of the immediate paragraph above, [SPVM] shall be solely responsible for its employment relationship with its workers, for the payment of wages, for any and all of the employment benefits generated, as well as for the Social Security fees, withholding and all income tax and an other that may be caused, in addition will also be responsible for any conflicts that may arise with such personnel.[7]

The SPVM guards reported directly to Jorge Romero, Synnex's Logistics Director, who managed the warehouse. (PSF 19.) Mr. Romero's "duties included making sure that the Warehouse and its contents were secure." (Dkt. No. 94-1, Ex. A, "Romero Decl." ¶ 4.) Mr. Romero gave the SPVM guards their schedules, (Dkt. No. 85-36, J. Ex. 35, "Romero Dep." 43:13–25), instructed them on "where to stay during their shift," and created the "procedures for making security rounds, [and] checking doors." (PSF 19.) Every night, the guards called Mr. Romero to report that the warehouse was safe. (Romero Dep. at 37:1–12.)

On the night of the theft, the perpetrators entered the industrial park where the warehouse is located with no apparent resistance from the two security guards stationed at the gate. (PSF 7.) Inside the warehouse, video surveillance showed Mr. Quintero providing the perpetrators with access through the front door, also without any apparent resistance. (*Id.* at 8.) After entering, the robbers beat, tied up, and drugged the second guard stationed inside the warehouse. (*Id.* at 9–10.) The robbers cleared out the warehouse; the three guards involved disappeared. (*Id.* at 11.) The Mexican police later discovered that Mr. Quintero had provided fake identification to SPVM. (JSF 18.) The morning after the robbery, the guards who arrived to relieve the night watch called Mr. Romero to report the theft. (Romero Dep. at 38:1–10.)

### B. The Crime Insurance Policy

Synnex purchased a crime insurance policy ("the Policy") with Axis that covered employee theft. (JSF 1.)[8] Relevant here are the clauses pertaining to which type of individuals and are losses covered.

---

[7] Dkt. No. 84-9, J. Ex. 9, "SPVM Contract" at SYNNEX 2260, 2263–64.

[8] Dkt. No. 85-1, "Ins. Policy".

The "Coverages" portion of the Policy states in relevant part:[9]

> **A. Employee Theft**
>
> **1. Theft of Insured's Property**
>
> The Insurer will pay for loss of or damage to **Covered Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not or acting alone or in collusion with others.[10]

The Policy defines "Employee" in relevant part as:

> **I.** **Employee** means any natural person who is:
>
> 1. employed by the **Insured** in the ordinary course of its business, whether on a full-time, part-time, temporary, seasonal, or volunteer basis, whose labor or service is subject to the **Insured's** direction and control, including any such person: (a) up to 90 days after termination of her or her employment with the **Insured**; or (b) while on leave of absence;[11]
>
> * * *
>
> 4. leased to the Insured under a written contract between the Insured and a labor leasing firm to provide labor or services for the Insured that are usual to the duties of an employee or officer, whose labor or service is directed by the Insured;[12]

The definition of an "Employee" expressly excludes independent contractors: "**Employee**, however, does not include any . . . independent contractor of any **Insured**."[13] Because of this, Synnex paid a premium to add an endorsement for independent contractors. Endorsement No. 6 provides:

> **ADD INDEPENDENT CONTRACTORS AS EMPLOYEES ENDORSEMENT**
>
> It is agreed that the following is added to the **Employee** definition:
>
> **Employee** also means any natural person independent contractor who provides services to the **Insured** in the ordinary course of the

[9] All defined terms in the insurance policy are bolded in the original.

[10] Ins. Policy at AXIS 6.

[11] *Id.* at 9.

[12] *Id.* at 10.

[13] *Id.*

> **Insured's** business pursuant to terms specified in a written agreement between such **Insured** and such independent contractor or his or her business.[14]

The "Definitions" section of the Policy also defines the scope of "Covered Property." Thus:

> E. **Covered Property** means **Money**, **Securities**, or **Property**.
>
> * * *
>
> U. **Property** means tangible property, other than **Money** or **Securities**, that has intrinsic value.[15]

Furthermore, under the "Exclusions" portion, the Policy provides:

> **A. Exclusions Applicable to All Coverages**
>
> * * *
>
> 5. **Intellectual Property and Confidential Information**
> This Policy does not apply to:
>
> a. loss of or loss resulting from theft, disappearance, destruction, release, or disclosure of, or access to, any trade secrets, intangible property or intellectual property.[16]

### C. Axis Denies Synnex's Claim

On September 18, 2019, Synnex filed a claim with Axis under the Policy, seeking the full recovery available under the policy—$10 million with a $1.25 million deductible—for its losses. (JSF 1.) Axis did not hire its own private investigator to analyze the circumstances of the theft nor did it conduct its own interviews with the witnesses at the warehouse. (PSF2 12, 15.) Instead, it relied entirely on documents submitted by Synnex to investigate the claim. (*Id.* at 20.)

Axis denied Synnex's claim under the "Theft of Insured's Property" provision because it found that the SPVM guards, including Mr. Quintero, were not employees as defined by the Policy. (JSF 28, PSF 14.) Though Axis admitted that the SPVM "guards were independent contractors," it insisted that they were not independent contractors covered under Endorsement No. 6 because "Synnex did not have a written contract with those guards or their business" as required thereunder. (PSF 14.) Axis also denied coverage under the theory that Mr. Quintero was a leased employee as defined by the Policy. (JSF 29, 30.)

---

[14] *Id.* at 27.

[15] *Id.* at 9.

[16] *Id.* at 13.

United States District Court
Northern District of California

This suit followed.

## II. LEGAL FRAMEWORK

### A. *Daubert* Motions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable. An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable. *See Thompson v. Whirlpool Corp.*, 2008 WL 2063549, at *3 (W.D. Wash. 2008) (citing *Daubert*, 509 U.S. at 589–90).

### B. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted). Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335–36 (3d ed. 1998)). If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

### C. Interpretation of Insurance Policies

Although "insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Yahoo Inc. v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh, PA*, 14 Cal.5th 58, 67 (Cal. 2022) (internal quotations and citation omitted). "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties." *E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal.4th 465, 470 (Cal. 2004). "Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Bay Cities Paving and Grading Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867 (Cal. 1993).

When coverage is in dispute, the initial burden is on the insured to prove that its claim falls within the scope of potential coverage. *Yahoo*, 14 Cal.5th at 68. If the insured does so, the burden then shifts to the insurer to "establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal.5th 216, 222 (Cal. 2018).

## III. ANALYSIS

### A. *Daubert* Motion (Dkt. No. 80.)

Synnex moves to (1) disqualify Mr. Haley on the grounds that "he has never been a claims handler and therefore lacks the expertise" to opine on the reasonableness of Axis's investigation, and (2) exclude portions of Mr. Haley's testimony as impermissible legal conclusions. Axis hired Mr. Haley to opine on the "quality of Axis's investigation and the reasonableness of its conclusion." (Dkt. No. 80-2, Ex. 1. "Haley Expert Report" ¶ 7.)

Mr. Haley is a lawyer whose practice has "centrally involved over 100 disputes regarding insurance coverage for crimes committed against corporations." (*Id.* at ¶ 1.) For the last twenty years, Mr. Haley has worked as a consultant and expert witness for parties to crime insurance policies. (*Id.* at ¶ 2.) From 1975 to 2012, Mr. Haley was a member of the American Bar Association's Committee on Fidelity and Surety Law. While a member, he wrote several articles on crime insurance policies. (*Id.* at ¶ 3.)

Mr. Haley concludes that "[a] reasonable insurer interpreting Endorsement 6 and applying

it to this claim would not agree with Synnex's Endorsement 6 argument." (*Id.* at ¶ 28.) Instead, he opines that Axis "interpreted the subject policy within the scope of fair claim handling procedures under California law." (*Id.* at ¶ 37.) He therefore concludes that Axis acted reasonably and "[t]he bad faith and punitive damages allegations of Synnex are well beyond what a reasonable claim handler could accept." (*Id.*)  In his rebuttal report, Mr. Haley additionally opines that Axis conducted a reasonable investigation into Synnex's claim: It had "two significant reports, plus significant case authorities, plus the Servicios-Synnex contract." (Dkt. No. 80-3, Exh. 2, "Haley Rebuttal Report" at ¶ 7.)

The Court finds that Mr. Haley is sufficiently qualified to offer certain opinions in this case. Mr. Haley's decades of experience working in the crime insurance industry and litigating insurance disputes is enough to establish the requisite "minimal foundation" for his opinion because there is a sufficient relationship between his industry experience and the opinions at issue. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (holding that decades of experience in relevant industry is sufficient to satisfy the "minimal foundation of knowledge, skill, and experience required in order to give 'expert' testimony" as to practices and norms in that industry). That Mr. Haley has not served as a claims handler does not alter the Court's finding.  Rule 702 does not require an expert to hold specific credentials or qualifications in the relevant subject matter. *See U.S. v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993). Instead, an expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Mr. Haley's experience and knowledge are qualification enough.

That said, much of Mr. Haley's report consists of legal conclusions. Mr. Haley opines, for example, that Synnex's interpretation of Endorsement No. 6 is unreasonable. Whether a contract interpretation is reasonable is a legal conclusion. *See E.M.M.I*, 32 Cal.4th at 470. Experts cannot give opinions on an ultimate issue of law. *U.S. v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015). To the extent Mr. Haley's testimony offers legal opinions, the Court declines to consider them and they are stricken as they are not appropriate for jury consideration either. Synnex's motion to exclude is therefore **GRANTED IN PART AND DENIED IN PART.**

**B. Breach of Contract**

The breach of contract claim focuses on two issues, namely, whether (1) Mr. Quintero was an employee and (2) the software preinstalled on Synnex's stolen hardware is covered property.

**1. Employee Coverage**

Synnex argues that Mr. Quintero was either an independent contractor under Endorsement No. 6, or alternatively, that he was a leased employee as defined under Section I. Employees, Part 4. The Court examines each.

**a. The Independent Contractor Endorsement**

Endorsement No. 6 provides:

> **Employee** also means any natural person independent contractor who provides services to the **Insured** in the ordinary course of the **Insured's** business pursuant to terms specified in a written agreement between such **Insured** and such independent contractor or his or her business.[17]

The parties dispute the meaning of the phrase "his or her business." Axis argues that coverage does not exist because there was no "written agreement between [Synnex] and [Mr. Quintero] or his or her business." (Dkt. No. 89, "Axis MSJ" at 25.) Synnex disagrees.

It is undisputed that Synnex contracted with SPVM, not Mr. Quintero. Synnex argues that the phrase "his or her business" could reasonably be interpreted "to mean the security company with which the guards were affiliated or associated." (Dkt. No. 83, "Synnex MSJ" at 2.) If correct, its interpretation of the provision would encompass Mr. Quintero. Axis disagrees and argues that the Endorsement only covers direct contracts between Synnex and the "natural person independent contractor" or "his or her business," not some third-party entity. (Axis MSJ at 30.)

As the insured, Synnex has the initial burden of demonstrating its claim is potentially covered. Here, Synnex cannot overcome the plain language of the provision. Endorsement No. 6 covers "natural person independent contractors" or "his or her business," said differently, a natural person's business. The provision does not contemplate third-party companies with whom Synnex may have contracted. There is a separate provision, the leased employee provision, that provides coverage precisely for that situation: where Synnex contracted with a third-party company for the

[17] Ins. Policy at AXIS 27.

services of a worker. To interpret Endorsement No. 6 as doing so as well would create surplusage in the contract. *See In re Tobacco Cases I*, 186 Cal.App.4th 42, 49 (Cal. 2010) (noting that courts "must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage").

Language in an insurance policy provision "must be construed in the context of that instrument as a whole, and in the circumstance of that case, and cannot be found to be ambiguous in the abstract." *Bay Cities Paving*, 5 Cal.4th at 867 (internal citation and quotations omitted). Based on both the plain language and the context of the Policy as a whole, the Court finds the only reasonable reading of the phrase "his or her business" is one that requires ownership, not affiliation.

Because the parties agree that Mr. Quintero was not self-employed, that is, he was contractually an employee of SPVM, the Court finds that the Independent Contractor Endorsement does not cover Synnex's claim. Synnex's motion for summary judgment on this basis is **DENIED** and Axis's cross-motion is **GRANTED**.

**b. The Leased Employee Provision**

Next, Synnex contends that Mr. Quintero is covered as a "leased employee" under Section I.4 of the Policy because (i) SPVM is a labor leasing firm; (ii) Mr. Quintero provided services that are usual to the duties of employees at Synnex; and (iii) Synnex directed his labor. (Synnex MSJ at 13–19.) Axis disputes all of these.

The Policy's definition of "Employee" includes a person:

> 4. leased to the **Insured** under a written contract between the **Insured** and a labor leasing firm to provide labor or services for the **Insured** that are usual to the duties of an employee or officer, whose labor or services is directed by the **Insured**[18]

Notably, none of the disputed terms referenced above are defined.

First, with respect to whether SPVM qualifies as a labor leasing firm, a "labor leasing firm" is "a company in the business of placing its employees at client companies for varying lengths of time in exchange for a fee." *Telamon Corp. v. Charter Oak Fire Ins. Co.*, 850 F.3d 866,

[18] Ins. Policy at AXIS 10.

870 (7th Cir. 2017) (internal citation and quotations omitted). SPVM employed security guards it hired out to Synnex for a fee pursuant to a written contract. It therefore qualifies as a labor leasing firm.

Axis's arguments do not compel otherwise. Its one-sentence argument does not focus on the nature of the firm itself, but instead its actions. (Axis MSJ at 25) ("[a]lthough Synnex had a contract with SPVM, SPVM is not a labor leasing firm because there is nothing in the agreement that suggests that SPVM was leasing employees to Synnex to perform the usual duties of an employee of Synnex.") Reciting the definition of a leased employee does not establish that this component of the definition is not satisfied.

Second, with respect to whether Mr. Quintero provided Synnex services "that are usual to the duties of an employee or officer," evidence exists that the responsibilities of its employee, Jorge Romero, satisfy this component. Mr. Romero, the Logistics Director at the warehouse, attested that his "duties included making sure that the Warehouse and its contents were secure." (Romero Decl. at ¶ 4.) For example, Mr. Romero testified that he received a phone call every night from the guards stationed internally at the warehouse to ensure the warehouse was safe. (Romero Dep. at 37:1–12.) The morning after the robbery, the guards who arrived to relieve the night watch called Mr. Romero to report the theft. (*Id.* at 38:1–10.) Mr. Romero also testified that he had worked with a security company to set up anti-burglary systems throughout the warehouse. (*Id.* at 40:7–25.) Finally, Mr. Romero testified that he acted as the security guard's manager. He gave them instructions on how to secure the premises and he set their schedules. (*Id.* at 43:13–25, 44:1–6, 46:1–15.) Axis does not dispute Mr. Romero's testimony. Rather, it argues that, because Mr. Romero did not act as a security guard himself, Synnex cannot establish that the SPVM security guard provides services that are usual to the duties of one of its employees. (Axis MSJ at 25.)

Axis does not persuade. The record shows that one of Mr. Romero's regular duties was warehouse security. The SPVM guards were hired to provide warehouse security under his supervision. They therefore provided services that were usual to the duties of a Synnex employee. That Mr. Romero's duties did not overlap entirely with those of the security guards he supervised does not compel a different result. The express language of this provision requires only that the

leased employee have duties that are *usual* to those of an employee, not the same.

The last issue concerns whether Synnex "directed" the labor of SPVM's security guards. Here, Axis argues that "Synnex had no right to control the guards" because the SPVM contract "assigned responsibility to direct and supervise" the guards to SPVM. (Axis MSJ at 22.) The SPVM contract does state that SPVM, not Synnex, is "the only [one] responsible for assuring its personnel respect at all times" Synnex's security norms. (SPVM Contract at SYNNEX 2260.) Though Synnex is asked to provide the "rules and specific norms" to be followed, it places the responsibility on SPVM to ensure that those security norms are respected. (*Id.* at 2260.) The contract further states that Synnex "may not, under any circumstances, order directly or indirectly the workers of [SPVM]." (*Id.* at 2263.)

Synnex does not dispute the plain language of the SPVM contract. Rather, it responds that, notwithstanding the contractual language, it directed the SPVM guards as a matter of fact. (Dkt No. 94, "Synnex Opp." at 8–9.) The record shows that Mr. Romero oversaw the security guards' day-to-day duties, including those of Mr. Quintero. Mr. Romero gave the SPVM guards their schedules, (Romero Dep. at 43:13–25), instructed them on "where to stay during their shift," and created the "procedures for making security rounds, [and] checking doors." (PSF 19.) Every night, the guards called Mr. Romero to report that the warehouse was safe. (Romero Dep. at 37:1–12.) Axis has no facts to the contrary.

The Court finds that Synnex did direct the SPVM guards. Because the evidence shows that "there is no triable issue as to any material fact," *see Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 843 (Cal. 2001), the Court finds that Mr. Quintero was covered under Section I.4 of the Policy. On this basis, the Court **GRANTS** Synnex's motion and **DENIES** Axis's cross motion on this issue.

### 2. Covered Property Provision

Next, the Court considers whether the software products that came preinstalled on the stolen hardware are covered under the Policy. Synnex argues that, because "the stolen software products were integrated with hardware, had a tangible form, and were intended for SYNNEX's customers, the value of these products is covered under the Policy." (Synnex MSJ at 20). Axis

disputes only that the embedded software is tangible property.[19] (Axis MSJ at 19–20.)

The Policy provides that Axis is liable for "Covered Property." "Covered Property" includes, in relevant part, "tangible property . . . that has intrinsic value." Furthermore, under the Intellectual Property and Confidential Information Exclusion, the policy excludes loss resulting from, among other things, the theft of "intangible property."

Synnex argues that its software products came preinstalled on the stolen hardware "and thus had been integrated into a product having a physical form." (Synnex MSJ at 23.) For that reason, the integrated computer devices, which included the hardware and preinstalled software, were tangible property. Furthermore, Synnex points out that its software is not excluded as intellectual property.

Axis responds that the integrated software products were not covered for two reasons. First, it argues that the software products were not "tangible property." Tangible property, Axis argues, is something corporeal that could be felt or touched. *Kazi v. State Farm Fire Ins. and Cas. Co.*, 24 Cal.4th 871, 880 (Cal. 2001) (tangible property "refers to things that can be touched, seen, and smelled"). Because software cannot be "seen or touched," it is intangible, Axis concludes.

Though the difference between what is tangible and intangible property is not always clear, the California Supreme Court has generally distinguished them as owning a right (intangible) rather than a physical object (tangible). *Microsoft Corp. v. Franchise Tax Bd.*, 212 Cal.App.4th 78, 88 (Cal. 2012). *Ladore v. Sony Comp. Entertainment America, LLC*, 75 F.Supp.3d 1065 (N.D. Cal 2014) is instructive. There, Judge Chen held that a video game contained in a disk was a "tangible chattel" under the California Consumer Legal Remedies Act ("CLRA"). *Id.* at 1073. Rejecting defendant's claim that software, such as a video game, was not tangible, the court found

[19] The Court finds that Axis has not met its burden of demonstrating that any other exclusions apply. The "Definitions" section explains that "Computer Programs" and "Electronic Data" are also excluded from "Covered Property." (Ins. Policy at AXIS 9.) Synnex made a point of arguing that its software products were not excluded under either definition. The burden, however, is on Axis, not Synnex, to demonstrate that an exclusion precludes coverage. *See The Travelers Property Casualty Co. of America v. Actavis, Inc.*, 16 Cal.App.5th 1026, 1044 (Cal. 2017) (burden is on insurer, not insured, to demonstrate that an exclusion applies). Because Axis did not argue that either the "Computer Programs" or "Electronic Data" exclusions applied, and Synnex appears to have correctly argued that they did not, the Court declines to find that the exclusions apply.

United States District Court
Northern District of California

that such an argument "ignored the critical fact" that the plaintiff had not simply downloaded a game, an arguably intangible thing, but rather purchased a disk with the game pre-lasered onto it, a tangible product. *Id*.

Here, the parties do not dispute that some of the stolen hardware came preinstalled with software. (JSF 40, PSF 26.) It is also undisputed that Synnex had either sold or was planning to sell these preconfigured devices as one package. (JSF 39.) Synnex's ownership interest was in a physical thing—the integrated computer—rather than a right. Like in *Ladore*, Synnex did not lose software it can simply re-download but lost a physical product made more valuable by the software pre-installed onto it.

Furthermore, the Intellectual Property and Confidential Information exclusion does not apply. The only dispute there is whether the pre-configured computers are "intangible property" under the exclusion. As stated, the Court finds that these integrated items are tangible, not intangible.

The Court therefore finds preinstalled software is "Covered Property" under the insurance policy. Synnex's motion for summary judgment on this basis is **GRANTED** and Axis's cross-motion is **DENIED**.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, the Court considers whether Axis is entitled to summary judgment on the implied covenant of good faith and fair dealing. Axis argues that, because this Court should find that it properly denied Synnex's claim, it could not have acted in bad faith. (Axis's MSJ at 32.) Alternatively, it argues it is entitled to summary judgment because its decision to deny Synnex coverage was "reasonable." (*Id.*) Synnex responds that that an insurance company cannot avoid liability for acting in bad faith through the "genuine dispute doctrine" if it failed to conduct a "full, fair, and thorough investigation." (Synnex Opp. at 12.)

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. This principle is applicable to policies of insurance." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002). In California, a breach of the implied covenant of

good faith in the insurance context has two elements: "(1) benefits due under the policy must have been withheld and (2) the reason for withholding benefits must have been unreasonable and without proper cause." *Love v. Fire Ins. Exchange*, 221 Cal.App.3d 1136, 1151 (Cal. 1990). "The reasonableness of an insurer's conduct is ordinarily a question of fact." *Pyramid Technologies, Inc. v. Hartford Casualty Insurance Co.*, 752 F.3d 807, 823 (9th Cir. 2014). If, however, there is "no potential for coverage under the [insurance] policy, a claim for bad faith cannot be brought." *Amadeo*, 290 F.3d at 1158. Additionally, "[i]t is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal.App.4th 335, 347 (Cal. 2001). A court can conclude as a matter of law that either there was no possibility of coverage or that there existed a genuine issue on whether it covered the claim. *Id.* at 785.

Judgment as a matter of law, however, depends on a *genuine* dispute. An insurer cannot fabricate a dispute and escape a bad faith claim. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001). The Ninth Circuit has suggested that one circumstance in which a dispute might not be genuine is when an "insurer failed to conduct a thorough investigation." *Id.*

As explained above, the Court finds that Axis is liable for coverage of Synnex's claim. Furthermore, evidence in the record suggests that Axis acted unreasonably by failing to conduct a full and fair investigation. (PSF2 12, 15) Therefore, the Court finds Axis is not entitled to summary judgment on either basis. Axis's motion for summary judgment on this basis is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, and good cause appearing, the Court finds as follows:

**GRANTS IN PART AND DENIES IN PART** Synnex's motion to exclude. The Court denies Synnex's motion to exclude Mr. Haley's expert opinion in its entirety but grants it to the extent Mr. Haley provides impermissible legal conclusions.

**GRANTS IN PART AND DENIES IN PART** both motions for summary judgment. In summary, the Court finds that the guard involved in the theft, Mr. Quintero, (i) was covered under the

section I.4 of the Policy including a leased employee as a covered employee although (ii) he was not covered an independent contractor. Because he was a leased employee, Axis is liable to Synnex for the losses incurred from the theft. Furthermore, the Court finds that, because Synnex's software was integrated into its stolen hardware, that software is covered under the Policy as tangible property.

Finally, because there is a material dispute of genuine fact regarding whether Axis acted in bad faith by failing to conduct a fair and reasonable investigation into Synnex's claim, the Court finds that Axis is not entitled to summary judgment on that claim.

This Order terminates Dkt. Nos. 80, 83, and 89.

**IT IS SO ORDERED.**

Dated: March 15, 2023

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California